IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM CHRISTOPHER SWETT,<br><br>Defendant. | Criminal No. 2:26-CR-00148-RMG |

**VARIANCE MOTION AND SENTENCING MEMORANDUM**

Defendant William Christopher Swett, by and through undersigned counsel, respectfully submits this Sentencing Memorandum and moves this Court, pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), for a downward variance from the advisory guideline range of 87 to 108 months calculated in the Second Revised Presentence Report ("PSR"). A sentence below the applicable range is sufficient, but not greater than necessary.

## INTRODUCTION

### 1. Personal History and Characteristics

Mr. Swett does not seek to minimize his actions through his variance request. He fraudulently obtained approximately $2 million through inflated expense reports, invented vendors, and false settlement claims. He also abused the trust placed in him as an attorney. He pleaded guilty to all eight counts of the Information without requiring an indictment or a trial. He has lost his licenses to practice law and will not practice again. Nothing in this memorandum asks the Court to look away from these facts.

In addition to these facts, however, Mr. Swett is an individual who is high-functioning, intelligent, and who has had significant professional success as an attorney. His crimes contrast

with the rest of his life, and understanding that life is critical to knowing how he ended up before this Court as a defendant, and not an attorney.

**a. A childhood of violence and sexual abuse**

Mr. Swett grew up in Hartsville, South Carolina. The Probation Officer documented what Mr. Swett endured as a child, as does his personal statement in Exhibit A. His father was the Chief of Police in Hartsville and physically and verbally abused both Mr. Swett and his mother. In one incident, his father pointed a firearm at his mother's head. Nothing was ever done since the abuser was the Chief of Police. PSR ¶ 75.

Looking for a positive father figure, Mr. Swett found Paul Rockholt, a man thirteen years his senior, through his church. From about age eight to thirteen, Rockholt sexually abused him. Rockholt slept in Chris's sleeping bag at youth retreats and, with the mother's permission, in the Chris's bed at home. PSR ¶ 70. Chris told no one. The abuse ended only when Chris was old enough to make it stop. Mr. Swett currently carries additional guilt related to Rockholt – when Mr. Swett was a teenager, a woman asked him about Rockholt, since Rockholt was around her children and she had concerns. He did not say anything to the woman about his abuse or about Rockholt. Rockholt was subsequently charged with sexually abusing the woman's child and convicted of criminal sexual conduct with a minor in the first and second degrees, a lewd act on a child, and disseminating harmful material to minors, based on the testimony of other child victims. Rockholt remains on the South Carolina sex offender registry. PSR ¶¶ 70 & n.6, 76. Mr. Swett carries guilt because he believes being honest with the woman may have spared other children from sexual abuse. PSR ¶ 70, Exhibit A. Despite Rockholt's convictions, Chris's mother maintained contact with him, communicating with Rockholt while he was in prison and sending him things.

**b. Gambling and alcohol use**

Mr. Swett learned to gamble as a teenager by placing sports bets with a local bookie for his father and joining weekly poker games attended by law enforcement officers, attorneys, judges, and legislators. Exhibit A. Alcohol became a problem in college and worsened after his father's death. PSR ¶ 77. However, despite his alcohol use, Chris was high-performing and successful. He received a full academic scholarship to The Citadel, graduated summa cum laude, and received his law degree from the University of South Carolina. After law school, he spent two years clerking for a federal judge and then had twelve years of successful practice at Motley Rice as a plaintiff's attorney. PSR ¶¶ 79, 81. Unfortunately, while Mr. Swett was having all this success, he was consistently gambling and abusing alcohol. The gambling steadily increased over time, until it consumed all his personal finances and eventually led him to choose to steal from his law firm to continue gambling. In early 2024, Motley Rice began to uncover evidence of Mr. Swett's crimes. By May 2024, less than two months after Motley Rice flagged the first suspicious check, he had already admitted his culpability to the firm through counsel. He repaid $23,100.00 on his own.

Throughout the period of his crimes, Mr. Swett did not live a lavish lifestyle inconsistent with his income. He did not make extraordinary purchases or use his proceeds to improve his lifestyle. It was, in fact, the opposite – his personal income went to the same place as the money he stole: gambling. Gambling consumed every financial avenue available to Mr. Swett and contributed to his decision to steal after his personal resources were exhausted. The Probation Officer recorded Mr. Swett's admissions to that effect in three places. PSR ¶¶ 21, 27, 28. Between April 2022 and April 2024 alone, Mr. Swett placed more than $11,000,000 in wagers and lost more than $1 million. Exhibit A. He earned a generous salary and still needed to invent reasons to borrow money to pay his mortgage. Exhibit A. The PSR identifies no real estate, offshore account, or accumulated wealth traceable to the proceeds, and it reports a household with $50 in monthly cash flow. PSR ¶¶ 82–83. Mr. Swett's financial ruin is well documented. Setting aside the residence

and vehicle titled to his wife and the vehicle his mother bought for his son, Mr. Swett's own reported assets total about $6,200, against reported liabilities of more than $366,000, including three civil judgments totaling $182,883.55. PSR ¶ 82.

It was inevitable that Mr. Swett's gambling and decision to steal would catch up with him. The gambling and attempts to cover it up were not sustainable, and he takes full accountability for his choices and has taken steps consistent with that accountability. He pleaded by Information. He completed counseling for gambling, alcoholism, and childhood abuse for the first time in his life and remains in mental health treatment. He took a job managing a Waffle House and was promoted to Unit Manager, putting his four children and his victims ahead of his pride.

**c. Medical Condition**

Mr. Swett has recurrent pulmonary emboli, a permanent and life-threatening condition. The records in Exhibit B show that he was hospitalized in October 2021 with bilateral pulmonary emboli and again in May 2023 with large bilateral emboli, including an acute saddle embolism and likely pulmonary infarct. The 2023 records note a prior catheter-directed thrombectomy. His physicians recorded that he will need "close pulm follow-up and lifelong anticoagulation" and transitioned him to apixaban (Eliquis) 5 mg twice daily "forever." Exhibit B at 19, 21–22. The problem list as of June 22, 2026, shows recurrent pulmonary emboli as active and confirmed. Exhibit B at 1; *see* PSR ¶ 74.

Lifelong anticoagulation requires uninterrupted medication, monitoring, and rapid access to emergency care for a recurrence or a bleeding complication. An anticoagulated patient is at elevated risk from ordinary injuries. These facts bear on the history and characteristics of the defendant under § 3553(a)(1), on the need to provide medical care in the most effective manner under § 3553(a)(2)(D), and on the real severity of any custodial term. Each month of imprisonment carries medical risks that a healthy defendant would not face. Mr. Swett asks that the judgment

record his diagnosis and medication needs so the Bureau of Prisons designates him to a facility with an appropriate level of medical care.

**d. Family and Children**

Mr. Swett has four children, aged 16, 14, 11, and 3. PSR ¶ 71. One son has alopecia, an autoimmune condition that has left him completely bald. Exhibit A. His daughter is young enough that a long sentence creates a real possibility that she will not remember her father when he returns. Mr. Swett's wife will carry the household alone. Her net income is $4,300 a month, the household has $50 in monthly cash flow, and day care alone costs $1,250 a month. PSR ¶ 82. Mr. Swett currently provides the family's health insurance through his employment, which will cease once he is imprisoned.

**e. Additional Factors**

Mr. Swett owes restitution of $2,379,735.88. PSR ¶ 102. Section 3553(a)(7) makes the need to provide restitution a sentencing factor, and a shorter sentence serves it directly. As well, specific deterrence and protection of the public under § 3553(a)(2)(C), support a variance. The Sentencing Commission's recidivism research shows that first offenders in their forties with post-graduate education and stable employment reoffend at among the lowest rates the Commission measures, which is why it adopted § 4C1.1. Mr. Swett has no criminal history, PSR ¶¶ 40–46, has complied with pretrial supervision, PSR ¶ 12, and has committed no offense since March 2024. State Senator Ed Sutton, a Citadel classmate and friend of more than twenty years, confirms that the causes of the offense have been confronted rather than excused: Mr. Swett has addressed his drinking and gambling through counseling, has never shifted blame, and shows a remorse that, in Senator Sutton's words, "is not performative, and it is not just fear of punishment." Exhibit C. He describes the conduct as "not consistent with the person we have known over many years," a man who helped establish the endowed Citadel Class of 2006 Scholarship and served on the Charleston

County Public Library Board of Trustees, and he commits to remaining among the "people who expect better from him and will help him stay on the right path." *Id.* The treatment, accountability, and lasting support Senator Sutton describes make reoffending unlikely, and none of it depends on additional years in custody.

**PROCEDURAL BACKGROUND AND ADVISORY GUIDELINE RANGE**

On February 23, 2026, Mr. Swett was charged by an eight-count Information with wire fraud (Counts 1–4), and money laundering (Counts 5–8). On March 19, 2026, he pleaded guilty to all eight counts. PSR ¶¶ 1, 8. He was released on a $50,000 unsecured bond and has complied with every condition of release. PSR ¶ 12. The PSR, as revised on November 3, 2026, calculates a Total Offense Level of 29 and, with Criminal History Category I, a range of 87 to 108 months. PSR ¶¶ 68, 85. As first disclosed on June 30, 2026, the PSR calculated a Total Offense Level of 23 and a range of 46 to 57 months.

**1. Federal Sentencing Principles**

Title 18 U.S.C. § 3553(a) seeks to achieve an equitable sentencing scheme. In determining the sentence to be imposed, a district court must consider the advisory guidelines range and the sentencing factors set out in Section 3553(a). *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006). District courts are mandated to impose a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

A defendant "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case." 18 U.S.C. § 3551(a).

The purposes of sentencing are set forth in Section 3553 (a)(2): (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to

afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. The sufficient-but-not-greater-than-necessary requirement is not simply another "factor" to be considered along with the others outlined in Section 3553(a). Instead, the sufficient-but-not-greater-than-necessary requirement sets an independent limit on the sentence a court should impose.

With the Sentencing Guidelines now advisory, District Court Judges have a renewed, virtually unlimited ability to consider facts relevant to the Section 3553(a) factors in fashioning a sentence. *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).

To comply with the four purposes described, the sentencing court must consider the following seven factors identified in 18 U.S.C. § 3553(a)(1)-(7), which are summarized as follows:

> *(1) The nature and circumstances of the offense and the history and characteristics of the defendant;*
> *(2) The need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public, and to provide educational or vocational training to the defendant;*
> *(3) The kinds of sentences available;*
> *(4) The kind of sentence and the sentencing range established pursuant to the U.S. Sentencing Guidelines;*
> *(5) Any pertinent policy statement issued by the Sentencing Commission;*
> *(6) The need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct and*
> *(7) The need to provide restitution to any victims of the offense.*

Consideration of the Guidelines is only "the starting point and the initial benchmark." *Gall v. U.S.*, 552 U.S. 38, 39, 128 S.Ct. 586, 596 (2007). The sentencing court must make an individualized assessment based on the facts presented and may not assume that the guidelines' range is reasonable. *Id*. at 40-41.

**a. Commission Data**

The PSR reports Judiciary Sentencing Information for defendants sentenced under § 2S1.1 at Total Offense Level 29 and Criminal History Category I, excluding those who received § 5K1.1 departures. Of 118 such defendants in fiscal years 2021–2025, 116 received a sentence of imprisonment. The average sentence was 65 months and the median was 70 months. PSR ¶ 106. The bottom of the PSR's range exceeds the average by 22 months and the median by 17 months. A sentence within the range would therefore be longer than what courts imposed on most comparable defendants, and § 3553(a)(6) directs the Court to avoid unwarranted disparities of that kind. The data also show that courts, applying § 3553(a), regularly sentence below this range for defendants like Mr. Swett.

**b. The Vulnerable Victim enhancement**

As first disclosed, the PSR gave Mr. Swett the two-level reduction for zero-point offenders under USSG § 4C1.1, which produced a Total Offense Level of 23. The November 3 revision deletes that reduction, PSR at 3 (summary of revisions, ¶ 68). The revised PSR found that almost all of his clients lived with a terminal illness or were a survivor of a loved one who died with mesothelioma. PSR ¶ 15. However, the PSR only identifies two individuals who were vulnerable victims, TD and DM, who had a total combined loss amount of approximately $38,000.00. PSR ¶ 15. The total amount of restitution in the case is over $2 million. As a result of these two victims and this relatively small loss amount, an enhancement applies; the zero-point offender reduction is lost, and the advisory guideline range nearly doubles, from 46-57 months to 87–108 months. The Court should consider that effect in deciding what sentence is sufficient, but not greater than necessary, whichever way it rules on the enhancement.

The Commission created the zero-point offender reduction because its research showed that offenders with no criminal history points reoffend at substantially lower rates than other

offenders, including those with a single point. The reduction expresses the Commission's judgment about recidivism risk, which is a § 3553(a)(2)(C) consideration. Mr. Swett's recidivism risk is still minimal, even taking into account the two vulnerable victims, and the reasoning of the zero-point offender reduction is still applicable to him. He is 42, has no arrests or convictions of any kind, PSR ¶¶ 40–46, holds a law degree, works full time, PSR ¶ 81, has complied with every condition of release, PSR ¶ 12, and is in treatment for the conditions that drove the offense. PSR ¶ 75. Those are the features the Commission relied on when it adopted § 4C1.1.

A sentencing court may vary from the Guidelines where it concludes that applying them mechanically does not serve the purposes of § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Here the reason for the reduction applies fully, even though the reduction itself may not.

**CONCLUSION**

Mr. Swett asks the Court to grant a downward variance and impose a sentence below the advisory guideline range. He further asks the Court to include the following recommendations in the judgment:

1. That the Bureau of Prisons designate Mr. Swett to Edgefield Camp SCP or another minimum-security facility as close as practicable to Charleston, South Carolina, to facilitate visitation with his four children;

2. That Mr. Swett be referred to the Residential Drug Abuse Program under 18 U.S.C. § 3621(e), in light of his documented history of alcoholism, PSR ¶ 77, and designated to a facility that offers it;

3. That the designation reflect his recurrent pulmonary emboli and lifelong anticoagulation therapy so that he is placed at a facility with an appropriate medical care level; and

4. That Mr. Swett be permitted sixty days to self-surrender to the designated facility on a date set by the Court and the Bureau of Prisons following designation.

Mr. Swett has taken full accountability for his actions, and asks that this Court consider the totality of his circumstances in imposing a sufficient, fair sentence.

Respectfully submitted,

Nathan Williams

Nathan S. Williams (Fed ID 10400)
Law Offices of Nathan S. Williams
266 W. Coleman Blvd., Suite 204
Mt. Pleasant, SC 29464
(843) 209-6972
E-mail: nathan@scfederaldefense.com

November 10, 2026
Mount Pleasant, SC